This is a proceeding brought under Act No. 20 of 1914, as amended, our Compensation Law, wherein plaintiff is seeking the maximum amount of compensation allowed by law for total and permanent disability from the compensation insurer of Modern Tire Service, plaintiff's employer.
Plaintiff alleges that during the first week of January, 1946, while in the course and scope of his employment, he "suffered an accident by striking his right knee against a steel cable, which pained him for a few minutes, and which pain soon ceased, and he continued working regularly until February 1, 1946, on which date while he was checking inventory in the stockroom on the premises of his employer, he stooped down to check the number of a box of rubber on the floor. When he tried to get up, his knee popped as though it were out of joint and he was sent to a doctor for treatment by his foreman, a Mr. Limbers. The doctor to whom he was *Page 625 
sent by his foreman treated him four times and sent him back to work, where he worked on his regular job for two days, on crutches, when his knee jumped out of place again, as alleged in plaintiff's petition.
Plaintiff further alleges that since Feb. 1, 1946, his knee has been swollen and locks while he tries to straighten it completely and is very painful and will continue to do so permanently; that his injury has been diagnosed by his physician as a strain of his knee with probable rupture of some soft fibrous tissues of his knee or an injured cartilage thereof, commonly called a "football knee"; that on May 15, 1946, he attempted to work for another employer as a plumber's helper, but was unable to continue work on account of his knee.
In answer, after admitting that it was the compensation insurer of the Modern Tire Service, plaintiff's employer, that it paid plaintiff $11 as compensation, and that plaintiff's wages were $42 a week, it categorically denied all of plaintiff's allegations.
On these issues the case was tried, resulting in a judgment granting compensation at the rate of $20 per week for a period not exceeding 400 weeks, commencing on February 1, 1946, with legal interest on each past due installment from its due date until paid, subject to a credit of $11.46; further judgment in favor of plaintiff and against defendant for medical expenses incurred by plaintiff, fixing the fees of expert witnesses and of plaintiff's attorney. Defendant has appealed. Plaintiff answered the appeal, praying for 10 per cent on the amount of judgment as damages for a frivolous appeal.
In this court, defendant contends as its only reason for reversal of the judgment that the plaintiff has failed to prove that he received personal injuries by an accident arising out of and in the course of his employment in accordance with Sections 2 and 38 of the Compensation Statute. Thus, this is the only question we have to consider.
Dart's Statutes, § 4392, Section 2, of Act No. 20 of 1914, as amended, Act No. 85 of 1926, provides that "If an employee * * * received personal injury by accident arising out of and in the course of such employment his employer shall pay compensation in the amounts and on the conditions and to the person or persons hereinafter provided."
Section 38 of the Act, as amended, Act No. 38 of 1918, Dart's Statutes, § 4427, provides that "The word 'Accident', as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected orunforeseen event happening, suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury. The terms 'Injury' and 'Personal Injuries' shall include only injuries by violence to thephysical structure of the body and such diseases or infections as naturally result therefrom * * *." (Italics ours).
The record discloses that plaintiff is an ignorant colored man, 37 years of age, with no trade or calling except as a plumber's helper and a tire rethreader. Plaintiff enjoyed a reputation as an excellent worker in his line. Prior to his employment by the Modern Tire Service, he had been employed by the Greely Plumbing Company as a plumber's helper for some three years. On account of the war, Mr. Greely discontinued his activities and plaintiff was then employed by the Modern Tire Service as a tire rethreader, giving satisfactory service to his employer, remaining in that employment for some three years when he quit on account of his alleged accident and injury.
Plaintiff testified that some three or four weeks prior to Feb. 1, 1946, he hit his right knee on a table while pulling a tire; his knee pained him for some 15 minutes; he continued to work without giving it any further thought until the occurrence of Feb. 1, 1946. On Feb. 1, 1946, while helping Mr. Limbers, the foreman in charge of the taking of the inventory, while squatting down, taking numbers, he arose and his knee "popped", hurting him a good deal. This happened at about 11 o'clock on the morning of Feb. 1, 1946. Mr. Limbers saw him in his sufferings, told him to sit down awhile to see if the *Page 626 
pains would not abate or his knee would not get better. Mr. Limbers then sent him to Dr. Long for treatment. Dr. Long recommended that he bathe his knee in hot water. He visited this doctor on four different occasions and was finally discharged to go back to work. He returned and attempted to work on crutches for a few days. On account of the pain and condition, he had to quit his employment. He then consulted Dr. Thom, who treated him. This doctor recommended that he seek employment. He did so, but he could not perform the duties required of him. On the second of August, a Dr. Young of Abbeville performed an operation on his knee.
Mr. Limbers, the operational manager and foreman of plaintiff's employer, admits that plaintiff, on Feb. 1, 1946, was helping him in taking inventory. He states "Jessie was helping me take the inventory by reading the weights off of the boxes, camel back, and he was down on his knees reading the numbers off the bottom row boxes and we finished that section and I moved on to the next one and looked back for Jessie and Jessie was on the floor holding his knee and I asked him if he was getting old, he said his knee had jammed on him and was hurting him a little bit * * *". He further states that plaintiff went ahead and completed the inventory and limped the rest of the day and the next day plaintiff did not show up. Two or three days later he went to see plaintiff "to see why he didn't come back to work." "He told me that he had bumped his knee at an earlier date, which I had no knowledge of". On account of plaintiff complaining of pain, the witness sent plaintiff to Dr. Long for treatment. Plaintiff thereafter came back and worked on a couple of days and limped around using a crutch. Thereafter, plaintiff failed to come back.
Dr. Long's report shows that the date of accident was February 1, 1946, date of disability February 1, 1946, date of first treatment, February 1, 1946. The nature and extent of injury: Contusion of the right knee.
According to the testimony of Dr. Thom, he first saw the plaintiff on February 18, 1946. Plaintiff gave him a history of having struck the end portion of his knee against a steel table which caused him pain and some disability, but not sufficient to keep him from continuing his work and that on February 1st, while he was stooping down doing some work and as he got up his knee popped and hurt him. When he, the doctor saw plaintiff on the 18th of February, plaintiff's knee was swollen and quite sensitive to pain on pressure on the inside of the knee. His diagnosis of the nature and extent of injury and his objective findings were "Contusion and sprain of the knee, most likely some soft tissue torn." He treated plaintiff by bandaging and rebandaging the knee and applied diathermy on it several times. The swelling went down and the knee apparently improved to such an extent that on April 15, 1946, he told plaintiff to try to work. He states that it occurred to him that plaintiff was probably suffering from a rupture of the semilunar cartilage but did not make such a diagnosis. He states that a rupture of internal semilunar cartilage is frequently caused by a direct trauma, but one may receive such an injury by the wrenching of the knee without a blow against the cartilage. He states, "My opinion later, after the thing went through the mill, was that the man actually damaged or ruptured that thing when he struck the knee against the table and when he got up in February he completed rupturing it."
Dr. Gustave R. Kuehnle examined plaintiff on March 7, 1946. His report is as follows: "I first saw Jessie O'Connor on March 7th, 1946. Jessie, at that time, gave me a history of having bumped his knee about seven weeks ago, was his words. He said that that stayed sore for quite some time but he continued to work. He said that around February 1st he was stooping down and on getting up his knee popped and since that time he said he had swelling and pain, that this pain varied at times but was more or less present at all times. It became worse after he had been standing for a long time. Now, I diagnosed him at that time. I also noted on that examination that he had a small amount of fluid behind the kneecap. He had a patella click, it would go back and *Page 627 
you could feel it go back and touch the articular surface of the tibia and femur, would give you a clicking sensation denoting fluid between the patella and this articular surface. I began to give this man diathermy. Altogether he had a total of fifteen diathermy treatments. The last diathermy treatment was on April 13th. At the end of that time the swelling had diminished, the evidence of fluid behind the patella was no longer present and he said that his knee felt much better but still gave him trouble, and I think at that time I recommended to Jessie that he try to go back to work and see how he could get along on this knee. I didn't see him any further until 7-17-46, at which time he came back complaining that his knee still continued to give him trouble. At this time he told me that his knee occasionally would lock and when in a flexed position and on extending it, it would pop and then unlock so he could complete the extension of the leg. The history at that time led me to make a tentative diagnosis of a possible laceration of the internal semilunar cartilage, and that was the last occasion I saw this man."
Further in his testimony the doctor states that he definitely is of the opinion that his laceration occurred as he was rising out of a stooping position. The following questions and answers of Dr. Kuehnle are pertinent:
"Q. Is that typical of how those things come about, ordinarily? A. The typical condition that produces these lacerations of the semilunar cartilage is a forcible medial internal rotation of the thigh with the leg slightly flexed and in a fixed position. You can get that sort of injury from rising from a stooping position if it was very forcible."
By The Court:
"Q. As I understand your testimony the striking of the knee against this metal object did not contribute to the rupture of the cartilage? A. I don't think it did."
"Q. However, it is your opinion that rising from this stooping position could have caused it? A. Yes, that is a typical type of injury that would cause it. The foot is fixed where it does not rotate with the thigh. The typical football knee is from a man being struck from the side, which produces the same thing. It is a force that strikes from the side with a leg in a semiflexed position producing an internal rotation of the femur on top."
As to the bump on the knee, the doctor states that plaintiff did inform him of such occurrence, but that he did not attribute such importance to it, "because it didn't produce, according to him, too much disability. He continued to work after that injury."
Dr. Moss M. Bannerman was offered as a witness for the defendant. The doctor states that he examined the plaintiff in July, 1946. On the examination, he states that it was his "impression that he had a torn medial cartilage in his right knee" and that he based his diagnosis on the "limitation of motion and tenderness over the medial aspect of the joint, anterially. The history of locking and catching which he had, together with swelling was fairly typical". There must be a torn cartilage or "some other loose body in the joint which can protrude between the joint surface for the knee to catch". He recommended that an operation be performed on the knee to determine the exact status therein and the cartilage, if it was torn, or whatever condition found, should be corrected.
He was then questioned by the Court as follows:
"Q. Doctor, do you consider this man in condition to do manual labor now? A. No, Sir.
"Q. He gives a history of having risen from a stooping position, following which he felt pain in this knee and then went to a doctor, and you know the treatment that has been accorded to him since that time; is such a history consistent with the statement of the opinion of this particular injury? By that, I mean from all that you have learned from your own examination and from the reports furnished you by other doctors, would that be consistent with his present condition, to say that the rising from the stooping position is what resulted in this condition? A. That is a *Page 628 
very difficult question to answer, Judge Herget, may I elaborate a trifle?
"Q. Yes, go ahead. A. These injuries, that is, a meniscus injury, semilunar cartilage, are usually incurred in earlier adulthood and they remain quiescent for a long period of time until re-activated by an additional injury, and the degree of that injury may be very trivial. I have had a number of instances in which the patient remembered no previous injury, that quite frequently happens that there has been fifteen or twenty years between the injury, and the person had a like knee after turning over in bed. The maxim of injury described by the plaintiff in this case of merely rising from a stooping position, a squatting position as I understood him to say, is not the usual maxim, but it is not sufficient from a medical standpoint to say that it could not have occurred in that manner.
"Q. As I understand your answer, it is possible for it to have happened in that manner? A. Yes, sir.
"Q. If he had previous to that time sustained some injury to his knee and not known about it, this could have aggravated his condition? A. Yes, sir.
"Q. And the condition he has would be consistent with that story? A. Yes, sir."
On August 1, 1946, plaintiff was examined by Dr. Marion O. Young of Abbeville, La. This doctor, upon examination of plaintiff, concurred in the diagnosis of an injured semilunar cartilage. He performed an operation, under spinal anesthesia, on August 2, 1946, and on exposure of the semilunar cartilage, the anterior portion was found quite loosened and damaged near its end or attachment to the anterior ligament. The entire cartilage was removed. The patient made an uneventful recovery. He was admitted to the hospital on the night of August 1st, and was discharged from the hospital on August 9th.
Although Mr. Limbers denied that plaintiff failed to inform him of the alleged striking of his knee on February 1, 1946, it is to be noted that on the report of the company to the insurer, on February 2, 1946, it is expressly stated that plaintiff made a report of his striking his knee some time prior to February 1, 1946.
[1] It is well established by our decisions that an accident can be proved by the plaintiff alone if there are corroborating circumstances. Plaintiff is fully corroborated that he did strike his knee some few weeks prior to February 1, 1946, by the histories he gave to the medical examiners and the report of the accident which his employer gave to its insurer on Feb. 2, 1946.
All the doctors agree that plaintiff, in his condition, cannot perform his former duties as a plumber's helper or a tire rethreader.
[2] It is well settled in our jurisprudence that the protection accorded by the compensation act of Louisiana against injury by accident comprehends and includes the giving way of affected parts of the body while at work, even though the disability was not the immediate result of an unusual strain or physical effort. Hill v. J. B. Beaird Corp., La. App., 19 So.2d 295 and the cases therein cited. The knee is an essential part of the body.
[3] It is therefore our conclusion that under the facts as outlined above, there was an "accident" in the intendment and meaning of the Statute. It is not contended that the plaintiff did not receive an injury in the course and scope of his employment.
[4] We find no merit in plaintiff's demand for damages on the ground that the appeal is frivolous. Defendant strenuously urged their contention that there was not an accident in the intendment of the law, and gave plausible reason and forceable argument in its favor.
For these reasons, the judgment appealed from is affirmed. *Page 629